BAUER, Circuit Judge.
Petitioner Nassuma Fomba Jabateh, a native and citizen of Liberia, filed a petition with this Court seeking to vacate an *334 order from the Board of Immigration Appeals that denied his applications for asylum and withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture, 8 C.F.R. § 1208.16(c). Petitioner’s applications were denied on the basis that he had provided material support to the Tier III terrorist organization Liberians United for Reconciliation and Democracy, and thus was rendered ineligible for any form of relief. Alternatively, the BIA also denied his applications on the merits. Further, the BIA denied Petitioner’s request for deferral of removal under CAT, because he failed to show that it was more likely than not he would be tortured if returned to Liberia, and Petitioner challenges that conclusion. Last, Petitioner seeks review of the BIA’s conclusion that it was jurisdictionally barred from reviewing his application for an adjustment of status. For the reasons that follow, we affirm the BIA’s decision.
I. BACKGROUND
A. Factual Background
A civil war engulfed Liberia from 1989 to 1997, claiming the lives of 200,000 people and displacing a million others into refugee camps in neighboring countries. A government official named Charles Taylor led a band of rebels known as the National Patriotic Front in invading Liberia from the Ivory Coast at the outset of the war. On July 14, 1989, Taylor’s rebels attacked Petitioner’s hometown of Barkedu and massacred fifty-eight Mandingo Muslims, including Petitioner’s brother, Abu Jaba-teh. On this same date, Petitioner was exiled to Guinea, where he stayed until 2003. The war ended in 1997 with a peace agreement and the election of Taylor to the presidency.
In July 1999, Liberian exiles formed the military and political organization Liberians United for Reconciliation and Democracy in response to dissatisfaction with the implementation of the 1997 peace agreement. LURD consisted mostly of Mandin-gos and Krahns, ethnic groups from northern Liberia that fought Taylor during the civil war. The group’s primary objective was to remove Taylor from office. LURD’s leader was Sekou Conneh, a former Guinean tax collector with close connections to the group’s financial backers and the president of Guinea.
In mid-2000, a civil war once again erupted in Liberia. LURD launched military operations from across the border in Guinea in order to unseat Taylor. The war had a religious undertone in that LURD forces were largely Mandingo Muslims, while government troops were mostly animists and Christians. LURD forces failed to stop criminal behavior by insurgents, such as raping and looting. The forces raped a young woman in front of her husband and children after she was accused of supporting the government. They also reportedly abducted Liberian refugees in Sierra Leone and forced them to haul weapons and goods under threat of injury or death. Those who complained of exhaustion, thirst, or hunger were shot and left to bleed to death.
While Petitioner lived in Guinea, he became close with Conneh, the head of LURD. Conneh asked Petitioner to interpret for him at doctor appointments and social activities because Petitioner spoke French. Petitioner would sometimes receive monetary compensation for his services, which he provided to Conneh. He acknowledges that he was aware of LURD’s status as an armed insurgent group, and that the group was connected in some way to the Guinean government. After returning to Liberia in 2003, Petitioner had no further contact with Conneh. That same year, representatives from Taylor’s government, LURD, and a second *335 insurgent group negotiated a peace treaty, which became effective on August 18, 2003. This treaty gave LURD control over several governmental departments; Taylor resigned his post as president and was exiled in Nigeria.
In September 2003, Petitioner was appointed to serve as Liberia’s Director of the Bureau of National Procurement; several subordinate employees resigned because they did not wish to work for a Mandingo Muslim. In addition, he received anonymous phone calls in which the callers threatened to do everything possible to remove him from his position.
Most alarmingly, Petitioner’s home was burned down by a large mob as part of a tribal and religious land dispute in October 2004. The mob was largely comprised of members of Taylor’s dissolved National Patriotic Front. Petitioner claims that the homes of several other Mandingo Muslim government officials also were burned down on the same day, and Petitioner believed that they were targeted because of their status as Mandingo Muslims. Sometime later, Petitioner’s office was raided and computers were stolen.
Petitioner entered the United States on May 7, 2005, on an A-2 visa, a nonimmi-grant visa that allows foreign officials to enter the country to engage in official duties or activities on behalf of their national government. Petitioner continued to serve as director of National Procurement. The purpose of his visit was to arrange for the purchase of stationery, office furniture, and equipment.
B. Procedural Background
A month after his arrival, Petitioner filed an affirmative application for asylum. Petitioner contended that he was eligible for asylum and withholding of removal because he suffered past persecution and fears future persecution on account of his status as a Mandingo Muslim, as well as his political opinion and membership in a particular social group — “Mandingo Muslims who are governmental officials.” He also contended that he was eligible for CAT protection because it was more likely than not that he would be subjected to torture with the consent or acquiescence of the Liberian government.
On May 23, 2008, an asylum officer found no basis to grant Petitioner’s application, and referred his case to Immigration Court. DHS issued a Notice to Appear to Petitioner, charging him with removability under 8 U.S.C. § 1227(a)(1)(C)(i), as an alien who failed to maintain nonimmigrant status. Petitioner conceded his removability-
On July 16, 2009, Petitioner applied for an adjustment of his immigration status, pursuant to § 13 of the Act of September 11, 1957, now codified at 8 U.S.C. § 1255b. An adjustment under § 13 is available to an alien who, having been admitted under §§ 101(a)(15)(A)(i) or (ii) or 101(a)(15)(G)(i) or (ii) of the INA, has performed diplomatic or semi-diplomatic duties, can establish compelling reasons why he or she is unable to return to the country that accredited them as a diplomat, and whose adjustment of status is in the national interest. See 8 C.F.R. § 245.3. Petitioner’s counsel requested that the Immigration Judge either terminate the proceedings to allow the adjudication of the petition before the U.S. Citizenship and Immigration Services, or set a hearing date at which point the IJ could consider the adjustment application on the merits prior to his other applications for relief. The government opposed termination, so the IJ scheduled a hearing.
The IJ conducted the hearing on May 6, 2011, during which Petitioner testified in support of his applications for relief. At the close of Petitioner’s testimony, the IJ *336 asked the government if it would be willing to terminate the case without prejudice to permit the USCIS to adjudicate Petitioner’s application for adjustment of status. The government contended that Petitioner was ineligible for such an adjustment because he provided material support to LURD. The IJ continued the case and ordered briefing from both parties on the issue, and offered Petitioner’s counsel an opportunity to file the adjustment application with USCIS.
At the next hearing on April 6, 2012, Petitioner’s counsel informed the IJ that Petitioner had not yet received a final decision on his adjustment application. The government anticipated that USCIS would recommend a denial, which it did on April 17, 2012, finding that the record was insufficient to conclude that Petitioner performed diplomatic or semi-diplomatic duties as required by law. Petitioner’s counsel agreed not to renew the adjustment application before the IJ, and instead, to defer an appeal of the decision to the BIA, rather than appeal to the USCIS Administrative Appeals Office.
The IJ found that Petitioner’s “sporadic, typically unpaid” interpretation services for Conneh did not constitute material support; nonetheless, the IJ denied Petitioner’s applications for asylum and withholding of removal, finding that Petitioner failed to prove past persecution or a well-founded fear of future persecution on a protected ground if he returned to Liberia.
Regarding Petitioner’s application for withholding of removal under CAT, the IJ found that Petitioner had not demonstrated that it was “more likely than not” that he would be tortured. Thus, the IJ denied all of Petitioner’s applications for relief and ordered him removed. Finally, the IJ found that Petitioner met the statutory requirements for second stage voluntary departure under § 240B of the INA, and granted him 60 days to depart the United States, subject to certain conditions.
Both the government and Petitioner appealed the IJ’s decision to the BIA. The government challenged the IJ’s grant of voluntary departure, as well as the determination that Petitioner had not provided material support to a terrorist organization. Petitioner challenged the denial of his applications for asylum, withholding of removal, and protection under CAT. He also challenged the IJ’s refusal to consider his application for adjustment of status.
First, the BIA disagreed with the IJ on the applicability of the material support bar, finding that the interpretive services provided by Petitioner to Conneh constituted material support. Therefore, the BIA determined that Petitioner was ineligible for asylum or withholding of removal under the INA and CAT. As a result, Petitioner’s only possible relief was deferral of removal under CAT, for which the BIA found that Petitioner failed to qualify.
Alternatively, the BIA affirmed the IJ’s ruling on the merits of the asylum and withholding of removal applications, finding that he had failed to prove both past persecution due to a protected ground and a well-founded fear of future persecution. In addition, the BIA concluded that neither the IJ nor the BIA had jurisdiction to consider Petitioner’s § 13 application for adjustment of status, as USCIS retained exclusive jurisdiction over such applications.
Last, the BIA found that while Petitioner was statutorily eligible for voluntary departure, he had failed to meet the conditions set forth by the IJ, and therefore the BIA refused to reinstate the voluntary departure period. Petitioner now appeals the BIA’s decision.
*337 II. DISCUSSION
Petitioner raises several arguments on appeal. First, he contends that both the IJ and BIA erred in refusing to consider his § 13 application for adjustment. Next, he argues that the BIA erred in determining that he provided material support to a terrorist organization. In addition, he contends that he is entitled to protection under CAT. He also challenges the BIA’s conclusion that he failed to demonstrate both past and future persecution. Finally, he argues that the BIA erred in affirming certain adverse credibility determinations made by the IJ.
“[W]e review the IJ’s decision wherever the Board has not supplanted it with its own rationale; where the Board has spoken, we review its opinion.” Sarhan v. Holder, 658 F.3d 649, 653 (7th Cir. 2011) (citation omitted). “Where ... the Board relies on the findings of the IJ but adds its own analysis, we review the IJ’s decision as supplemented by the Board’s additional reasoning.” Yi Xian Chen v. Holder, 705 F.3d 624, 628 (7th Cir. 2013) (internal citation omitted). We review agency findings of fact for “substantial evidence” and may reverse, the IJ’s determinations “only if we determine that the evidence compels a different result.” Abraham v. Holder, 647 F.3d 626, 632 (7th Cir. 2011) (emphasis added) (citing Balogun v. Ashcroft, 374 F.3d 492, 498 (7th Cir. 2004)). We review the BIA’s legal conclusions de novo, and “owe the Board deference in its interpretation of the INA.” Durom-Ortiz v. Holder, 698 F.3d 523, 526 (7th Cir. 2012) (citation omitted). “Thus, we are not at liberty to overturn the Board’s determination simply because we would have decided the case differently.” Bueso-Avila v. Holder, 663 F.3d 934, 937 (7th Cir. 2011) (quotation marks and citation omitted).
A. Section 13 Application for Adjustment of Status
Petitioner first argues that the IJ and BIA erred in refusing to consider his § 13 application for adjustment. The BIA concluded that it and the IJ had no jurisdiction to consider Petitioner’s § 13 application because no regulation or statute explicitly provided such authority. While this is a matter of first impression for this circuit, the text of the relevant regulations and statutes provides a useful starting point in resolving the issue.
As explained above, an adjustment under § 13 is limited to an alien admitted under §§ 101 (a)(15)(A)(i) or (ii) or 101(a)(15)(G)(i) or (ii) of the INA, who has performed diplomatic or semi-diplomatic duties, can establish compelling reasons why he or she is unable to return to the country that accredited them as a diplomat, and whose adjustment of status is in the national interest. See 8 C.F.R. § 245.3. Here, USCIS determined that Petitioner failed to demonstrate that he had performed diplomatic or semi-diplomatic duties. Rather than appeal to the USCIS AAO, Petitioner sought review before the BIA.
Petitioner argues that under 8 C.F.R. § 1245.2(a)(1)(i), he should have been able to renew his application before the IJ and the BIA because the IJ has exclusive jurisdiction over any application for adjustment of status. However, the regulation that Petitioner relies upon is applicable only to adjustment applications filed pursuant to INA § 245, see 8 U.S.C. § 1255, not adjustment applications filed pursuant to § 13, see 8 U.S.C. § 1255b. The flaw in Petitioner’s argument is his failure to recognize the distinct administrative process in place for § 13 applications.
8 C.F.R. § 245.3 directs § 13 applicants to file their applications with the “director having jurisdiction over the applicant’s *338 place of residence.” The term “director”, as defined in 8 C.F.R. § 1.2, refers to a district director for USCIS. See Matter of Sesay, 25 I. & N. Dec. 431, 432 n.1 (BIA 2011) (noting that USCIS has authority to adjudicate adjustment of status applications); USCIS Adjudicator’s Field Manual 23.10(c); see also Chien-Shih Wang v. Att’y Gen. of United States, 823 F.2d 1273, 1275 (8th Cir. 1987) (establishing that prior to the transfer of INS functions from DOJ to DHS in 2003, § 13 applications were filed with the INS district director). Therefore, it is clear from the text of the regulation that the IJ does not have exclusive jurisdiction over § 13 applications.
In support of his argument, Petitioner mistakenly relies upon 8 C.F.R. § 1245.2, which describes the administrative process for INA § 245 applications. Section 1245.2(a)(1)(i) states that “[i]n the case of any alien who has been placed in deportation proceedings or in removal proceedings (other than as an arriving alien), the immigration judge hearing the proceeding has exclusive jurisdiction to adjudicate any application for adjustment of status the alien may file.” It is unclear why Petitioner believes this regulation should supplant the one specifically written to govern § 13 applications, but we decline Petitioner’s invitation to do so.
Petitioner argues in the alternative that even if the IJ does not have exclusive jurisdiction over § 13 applications in removal proceedings, the IJ and BIA have jurisdiction to review a renewed application in such proceedings. Petitioner cites to the U.S. District Court for the District of Columbia’s decision in Maalouf v. Wiemann, 654 F.Supp.2d 6 (D.D.C. 2009), in support of his argument. In Maalouf, the court declined to rule on an alien’s claim that the AAO violated the Administrative Procedures Act in denying her § 13 application. The court reasoned that the alien, who had since been placed in removal proceedings, could renew her application before the IJ during the removal proceedings, and could appeal an unfavorable decision to the BIA. 654 F.Supp.2d at 9.
We note that appellate jurisdiction over § 13 application denials is within the purview of the AAO. See USCIS Adjudicator’s Field Manual 23.10(f)(4). Prior to the creation of the AAO, applicants had the right to appeal to a regional commissioner of the INS. See, e.g., Matter of Aiyer, 18 I. & N. Dec. 98 (BIA 1981) (§ 13 application appeal decided by INS Regional Commissioner); Matter of Vargas, 14 I. & N. Dec. 354 (BIA 1973) (same). Aside from the statement in Maalouf, we cannot find any support for Petitioner’s contention that appeals of § 13 applications are within the purview of the IJ or BIA.
In our view, the Maalouf comet made the same error as Petitioner in that it conflated the administrative process for adjustment applications under INA § 245 with that of § 13 applications. The two federal circuit court cases that the Maalouf court relied upon for the proposition that an unsuccessful applicant for adjustment of status can renew his or her application in immigration proceedings dealt with INA § 245 applications, rather than § 13 applications. See Pinho v. Gonzales, 432 F.3d 193, 197 (3d Cir. 2005); Howell v. INS, 72 F.3d 288, 289 (2d Cir. 1995). This distinction is crucial.
Under 8 C.F.R. § 245.2(a)(5)(ii), an alien seeking adjustment of status under INA § 245 has “the right to renew his or her application in [removal] proceedings under 8 C.F.R. part 240.” However, 8 C.F.R. § 245.3, the regulation relevant to § 13 applications, contains no such statement, and instead applicants are directed to appeal to the AAO, as described above. Therefore, in our view the administrative *339 process for § 13 applications stands in stark contrast to that of INA § 245 applications. This makes sense, given the fact that § 13 is not part of the codified INA. See Note, 8 U.S.C. § 1255b. Thus, we are unpersuaded that Petitioner may renew his § 13 application before the IJ or BIA.
The thrust of Petitioner’s argument is that the BIA and IJ may exercise jurisdiction over § 13 applications barring any statutory language expressly forbidding it. But this line of argument has been foreclosed by. the Supreme Court, which found that “the BIA is simply a regulatory creature of the Attorney General, to which he has delegated much of his authority under the applicable statutes.” INS v. Doherty, 502 U.S. 314, 327, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992). The Court held that the Attorney General “is the final administrative authority in construing the regulations, and in deciding questions under them.” Id.; see also 8 C.F.R. § 1003.1(d)(1) (“The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it.”); id. § 1003(d)(1)(i) (“The Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General[.]”). Petitioner’s argument that .the IJ and BIA possess any authority not expressly precluded by statute is simply at odds with this clear admonishment from the Court and the express language of the relevant regulations. The Attorney General has spoken unequivocally on this issue — authority to review § 13 applications lies not with IJs or the BIA, but rather with US-CIS and its AAO.
Petitioner offers one final argument on this issue: that the BIA’s failure to review his § 13 application violated his due process rights. We find this argument unavailing. We have held that an alien “does not have a due process right to seek relief from removal that is purely discretionary, such as adjustment of status, because he has no protected liberty interest in obtaining such relief.” Cadavedo v. Lynch, 835 F.3d 779, 784 (7th Cir. 2016) (citation omitted). Further, we note that according to the record before us, Petitioner never appealed his application denial to the AAO. Where an applicant has failed to avail himself of the administrative process available to him, we are precluded from considering the argument. Pjetri v. Gonzales, 468 F.3d 478, 481 (7th Cir. 2006). Accordingly, we find that the BIA and IJ did not err in refusing to consider Petitioner’s § 13 application for adjustment.
B. Material Support Bar
Petitioner next argues that the BIA erred in determining that he provided material support to a terrorist organization. A portion of the INA provides that any alien who has “engaged in a terrorist activity” is ineligible for admission into the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(I). These aliens are precluded from several forms of relief, including asylum, withholding of removal, and CAT protection in the form of withholding. See Khan v. Holder, 766 F.3d 689, 698 (7th Cir. 2014); see also 8 U.S.C. § 1158(b)(2)(A)(v) (stating, in effect, that an alien who is inadmissible or deportable on terrorism-related grounds is ineligible for asylum); 8 U.S.C. § 1231(b)(3)(B)(iv) (same for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (same for withholding under CAT); But they remain eligible for deferral of removal under CAT. See Khan, 766 F.3d at 698; 8 C.F.R. § 1208.17(a) (directing that aliens eligible for CAT protection but subject to terrorism-related bars be granted deferral of removal).
*340 Under the INA, terrorist activity is defined expansively to include “committing] an act that the actor knows, or x-easonably should know, affords material support” to a terrorist organization. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). This is commonly referred to as the “material support bar” to relief. The term “material support” includes providing “a safe house, transportation, communications, ... material financial benefit, false documentation or identification, weapons [], explosives, or training[.]” Id.
Terrorist organizations are divided into three tiers: Tier I and II organizations are determined by the Secretary of State and published in the Federal Register, while Tier III organizations are any others that engage in terrorist activities.[1] Id. § 1182(a)(3)(B)(vi). If an alien gave material support to a Tier I or Tier II organization, he is barred from entry regardless of whether he knew it was a terrorist organization. Compare id. § 1182(a)(3)(B)(iv)(VI)(cc), with (dd). However, if a group is in Tier 3, the alien has an oppoi’tunity to “demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization.” § 1182(a)(3)(B)(iv)(VI)(dd). This is known as the “knowledge exemption” to the material support bar. See FH-T v. Holder, 723 F.3d 833,839 (7th Cir. 2013).
Here, both the IJ and BIA determined that LURD was a Tier III terrorist organization. Neither party disputes this designation. The BIA further determined that Petitioner’s provision of interpreter services to Conneh, LURD’s leader, constituted material support under the INA. In this respect, the BIA’s decision parted ways with that of the IJ. The BIA also found that Petitioner failed to prove by clear and convincing evidence that he did not know and should not have known that LURD was a terrorist organization. Consequently, the BIA found that the knowledge exemption did not apply to Petitioner.
On appeal, Petitioner does not challenge the BIA’s finding regarding the knowledge exemption. Instead, he argues that the BIA failed to give deference to the IJ’s factual and legal determinations. Although we are foreclosed from reviewing the BIA’s factual determinations on this issue, see 8 U.S.C. § 1158(b)(2)(D), we note in passing that the BIA credited the IJ’s factual determinations, but simply came to a different legal conclusion. Petitioner also challenges the BIA’s determination that his interpreter services constitute material support under the INA. The government contends that this argument is also unre-viewable because it is a factual challenge. However, Petitioner is challenging the finding that his actions with l’espect to LURD met the legal definition of “material support.” Petitioner asserts a quintessential legal error, one which we are entitled to consider. See Gutierrez v. Lynch, 834 F.3d 800, 804 (7th Cir. 2016) (“[W]e retain jurisdiction to review questions of law and constitutional claims[.]”); see also 8 U.S.C. § 1252(a)(2)(D). However, this is as much traction as his argument gets.
Petitioner contends that the sporadic and infrequent nature of his interpreter services to a LURD member for medical appointments and social errands renders his support beyond the bounds of the material support statute because it occurred outside the context of the group’s terrorism-related activities. Yet Petitioner *341 acknowledges that under circuit precedent, an individual may offer material support “even if [the] support is confined to the nonterrorist activities of the organization.” Hussain v. Mukasey, 518 F.3d 534, 538 (7th Cir. 2008); see also Khan, 766 F.3d at 698. We also note that “communications” is a form of material support delineated in the statute. Petitioner argues that his case is distinguishable from Hussain and Khan because his support was unrelated to LURD.
The BIA rejected this argument, reasoning that terrorist group leaders “often use social activities to network, to promote their organization, and to recruit new members or supporters.” The Hussain and Khan courts employed a similar analysis in rejecting the petitioners’ argument that supporting the peaceful arm of a terrorist group could not constitute material support. See Hussain, 518 F.3d at 538-39; Khan, 766 F.3d at 698. This reasoning has equal force here. The statute also makes clear that the material support bar prohibits the provision of material support not only to a terrorist organization, but also “to any member of such an organization.” 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Therefore, the fact that Petitioner offered support to a LURD member rather than the organization itself is immaterial.
We note that the Supreme Court has taken a similarly expansive view of what constitutes material support in the context of the criminal statute banning material support to foreign terrorist organizations, stating that “[m]aterial support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways.” Holder v. Humanitarian Law Project, 561 U.S. 1, 30, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (internal quotation marks, alteration, and citation omitted). The Court observed that terrorist organizations systematically conceal their activities behind charitable, social, and political fronts. Id. (citation omitted). “Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.” Id. at 30-31, 130 S.Ct. 2705 (citation omitted). Accordingly, the Court found that “seemingly benign support” can constitute unlawful material support. Id. at 36,130 S.Ct. 2705.
In light of circuit and Supreme Court precedent, we find no error in the BIA’s conclusion that Petitioner provided material support to LURD. This finding is fatal to Petitioner’s applications for asylum and withholding of removal under both 8 U.S.C. § 1231(b)(3) and CAT. See Khan, 766 F.3d at 698. Consequently, we find that Petitioner is ineligible for asylum and withholding of removal.
C. Deferral of Removal under CAT
Petitioner offers a threadbare assertion that, at a minimum, he is entitled to deferral of removal under CAT. The BIA denied him this relief. Although we have determined that Petitioner is ineligible for asylum or withholding of removal, we may still determine whether Petitioner is entitled to deferral of removal under CAT. See id.; see also 8 C.F.R. § 1208.16(c)(4).
“We review the denial of CAT protection under the highly deferential substantial evidence test[.]” Rashiah v. Ashcroft, 388 F.3d 1126, 1131 (7th Cir. 2004) (citations omitted). We review the entire record as a whole and reverse “only if the record evidence compels a contrary conclusion.” Lenjinac v. Holder, 780 F.3d 852, 855 (7th Cir. 2015) (emphasis added) (citations omitted). In order to receive CAT protection, the Petitioner has the burden to demonstrate that “it is more likely than not that [the Petitioner] would be tortured *342 if removed to [Liberia].” 8 C.F.R. § 1208.16(c)(2). “Torture is defined as the intentional infliction of severe pain or suffering for the purpose of coercion, punishment, or discrimination,” but it does not include “lesser forms of cruel, inhuman or degrading treatment or punishment,” or “suffering inherent to lawful sanctions imposed for violating the law.” Borovsky v. Holder, 612 F.3d 917, 923 (7th Cir. 2010) (quoting 8 C.F.R. § 208.18) (quotation marks omitted). In addition, CAT protection requires evidence that the Petitioner will be tortured by the government, or with the government’s acquiescence. Khan, 766 F.3d at 698.
Here, the BIA agreed with the IJ that the Petitioner did not show that it is more likely than not that he would be tortured if he was removed to Liberia, and therefore denied him relief. Although neither the BIA nor the IJ provided a robust analysis on this issue, we have no trouble concluding that their finding is supported by substantial evidence. It is clear that Petitioner simply rested on the evidence he offered in support of his asylum and withholding of removal applications to prove that he would be subjected to torture. The BIA noted that Petitioner failed to submit any evidence that he was subjected to torture in the past, or would likely be subjected to it should he be returned to Liberia. The IJ similarly found that the evidence submitted by Petitioner did not rise to the level of torture.
Importantly, record evidence indicates that country conditions have improved since the end of the civil war and its aftermath. There is no indication that the government or its agents have committed arbitrary or unlawful killings. The 2010 State Department Human Rights Report states that Mandingo Muslims hold political office and have not been targeted with violence. In short, the record lacks evidence to substantiate Petitioner’s professed fear of torture. Therefore, we agree with the BIA and the IJ’s conclusion that Petitioner has not met his burden to establish eligibility for protection under CAT. As a result, Petitioner is not entitled to deferral of removal.
D. Petitioner’s Remaining Arguments
We briefly turn to Petitioner’s remaining arguments on the merits of his asylum and withholding of removal applications. Specifically, Petitioner contends that the BIA erred in its conclusion that he failed to demonstrate both past and future persecution in support of his asylum and withholding of removal applications. However, due to the applicability of the material support bar as an alternative basis for finding ineligibility for asylum and withholding of removal, we need not delve further into this argument. See INS v. Bagamasbad, 429 U.S. 24, 25, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976) (collecting cases) (“As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.”); see also Achacoso-Sanchez v. INS, 779 F.2d 1260, 1263 (7th Cir. 1985).
Similarly, it would be futile to analyze Petitioner’s argument that the BIA erred in affirming the IJ’s adverse credibility determinations. The adverse credibility determinations go toward the merit of Petitioner’s asylum and withholding of removal applications. Therefore, any analysis regarding errors in the BIA’s adverse credibility determinations would be purely academic. Furthermore, the adverse credibility determinations did not impact our finding that Petitioner had not met his burden of establishing eligibility for deferral of removal under CAT. The denial of deferral turned on the lack of torture- *343 specific evidence, not the BIA’s adverse credibility determinations. Accordingly, we decline to address Petitioner’s remaining arguments.
III. CONCLUSION
For the foregoing reasons, Petitioner’s petition is DENIED and the BIA’s decision is AFFIRMED.

. Unlike Tiers I and II, the government does not maintain a formal list of organizations falling under Tier III.