In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1369

FRANCISCO JAVIER PEREZ,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A059-606-737.

ARGUED DECEMBER 13, 2017 — DECIDED MAY 2, 2018

Before WOOD, *Chief Judge*, and MANION and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Francisco Javier Perez, a Honduran citizen, petitions for review of the denial of his application for deferral of removal under Article 3 of the Convention Against Torture. The Board of Immigration Appeals dismissed his appeal from an immigration judge's decision denying his application and ordering his removal to Honduras. In the Board's

view, the IJ correctly decided that Perez had not shown that, if removed to Honduras, he was more likely than not to be tortured with the acquiescence of a public official by a street gang. In this court, Perez argues that the immigration service erred by failing to make factual findings about whether he would have been tortured had he not narrowly escaped the gang's violent recruitment efforts years earlier and that the Board improperly did not consider whether, if removed to Honduras, he could live safely and openly there as an unwilling recruit of this gang. We conclude that the Board erred by truncating the crucial factual inquiry about Perez's risk of torture if he is returned to Honduras and by asking the wrong question with respect to internal relocation. We therefore grant the petition for review and remand to the Board for further proceedings.

## I

Perez grew up in Danli, Honduras, where the MS-13 street gang tried to recruit him as a member. In 2003, when Perez was 14, MS-13 gave him two weeks to decide whether to join their ranks or "suffer the consequences." Instead of joining MS-13, Perez moved in with his grandmother in another part of Danli. Later that year, MS-13 members confronted Perez on his way to school about joining them. Perez responded by running away and then dropping out of school.

Two or three years later, Perez witnessed the murder of a friend, who, Perez suspected, was slain to "settl[e] the score" involving a dispute among local gangs. Perez thought that his friend was shot to death because the friend's brother belonged to a rival gang of MS-13. The murder did not lead to any criminal charges, because the shooter's family threatened Perez and others not to testify about it. Two men backed up

the threats by beating Perez. Later an unidentified person fired shots in the direction of Perez and his friends, but they fortunately were not hit. Perez reported these events to the police, but the authorities did nothing in response.

In 2008 Perez was admitted to the United States as a lawful permanent resident. He joined his stepfather and sister in Indiana, where he had several factory jobs. He returned to Honduras in 2010 for a two-week vacation. While in Danli, he attended a neighborhood festival. There he was recognized by the same MS-13 members who had tried to recruit him in 2003; he evaded them by quickly running to his grandmother's house. Scared by this encounter, Perez cut short his vacation and returned to the United States.

Three years later and back in Indiana, Perez pleaded guilty to engaging in sexual misconduct with a minor in violation of IND. CODE § 35-42-4-9(a), and was sentenced to six years' imprisonment. After his conviction, the Department of Homeland Security took Perez into custody and served him with a Notice to Appear in removal proceedings. DHS asserted that Perez was removable because he had committed "sexual abuse of a minor," an aggravated felony, see 8 U.S.C. § 1101(a)(43)(A). The IJ sustained the charge and noted that Perez was ineligible for asylum and withholding of removal because his aggravated-felony conviction was a "particularly serious crime" under 8 U.S.C. §§ 1158(b)(2)(A)(ii), (B)(i), 1231(b)(3)(B)(ii).

Perez's disqualification for other forms of immigration relief did not, however, foreclose action under the CAT, which permits deferral of removal even for those who are ineligible for asylum or withholding. See 8 C.F.R. § 1208.17. Perez accordingly sought deferral. In his application, he stated that his

friend was "killed because he was thought to be part of [a] street gang," and that he received threats from MS-13, who told him that "if I did not join them I would be killed." He also expressed the belief, based on his encounter with MS-13 in 2010 and the rampant gang violence in Honduras, that he would be harmed if he were returned to that country. At his hearing, he emphasized his fear of the gang violence throughout Honduras and reiterated his conviction that he would be pressured (via threats) to join MS-13 if removed there. Various family members also testified at the hearing and expressed their fear that Perez would be killed if he were removed to Honduras and refused to join a gang. Perez also submitted various news articles documenting the significant gang violence in Honduras, and he filed letters of support from family members.

The IJ denied Perez's application for deferral of removal. Although he found Perez's testimony credible, the IJ decided that he had not met his burden to show that if he were returned to Honduras, he would more likely than not be tortured. In support of this conclusion, the IJ emphasized that Perez had not previously been tortured by any gangs because he had "fortunately … evade[d] them or run away" and that Perez had failed to connect the violence in Honduras to his personal circumstances. The IJ also determined that Perez had not shown that he could not relocate safely within Honduras.

Perez appealed to the Board, arguing that the IJ wrongly decided that his submissions and testimony fell short of the showing he needed to make for deferral of removal. The Board upheld the IJ's decision, pointing out that Perez had "not been tortured in the past by the gangs he fears" and concluding that his "fear of future torture is speculative, and not

based on a specific current threat to himself." The Board also agreed with the IJ that Perez had not demonstrated that "if he remains fearful of those who harmed or threatened him in the past, he would be unable to relocate in Honduras to avoid those threats." The Board ultimately concluded that Perez was not entitled to deferral pursuant to the CAT.

## II

An applicant seeking to defer removal under the Convention Against Torture has the burden of demonstrating that "it is more likely than not that [he or she] … would be tortured" if sent to "the proposed country of removal." 8 C.F.R. §§ 1208.16(c)(3), 1208.17(a). Recognizing that this inquiry does not lend itself to mathematical precision, we have understood this language to call for "a substantial risk that a given alien will be tortured if removed from the United States." *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015). The government urges us to abandon this description, but we think that it is making too much of semantics. As we recently explained in *Perez-Montes v. Sessions*, 880 F.3d 849, 850 (7th Cir. 2018), we apply the substantiality test with the concept embodied by the Convention's language in mind.

When all is said and done, the CAT requires a prediction about what will happen if the applicant for relief is returned to the proposed country of removal. 8 C.F.R. § 1208.16(c)(3). The burden is on the petitioner to demonstrate eligibility for deferral of removal. *Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016). When evaluating the petitioner's evidence, the IJ "must address various factors such as evidence of past torture, ability to relocate within the country, evidence of grave human rights violations or other relevant country conditions." *Orellana-Arias v. Sessions*, 865 F.3d 476, 489 (7th Cir. 2017); see 8

C.F.R. § 208.16(c)(3)(i)–(iv). When, as in this case, the Board agrees with the IJ and supplements his or her opinion with observations of its own, "we review the IJ's decision wherever the Board has not supplanted it with its own rationale; where the Board has spoken, we review its opinion." *Jabateh v. Lynch*, 845 F.3d 332, 337 (7th Cir. 2017) (internal quotation marks and citation omitted). The agency's factual findings must be supported by substantial evidence; we give plenary consideration to legal conclusions. *Id*.

## A

Perez's key argument is that the IJ and then the Board cut off their inquiry prematurely, after they noted that Perez had not actually been tortured in the past. He freely admits the fact that MS-13 did not manage to torture him, but he argues that the relevant inquiry is more complex. There are many gradations, he contends, between completed acts of torture (warranting relief) and mere harassment (not warranting relief). For example, if the only reason why someone is not shot is because she was lucky and dodged a bullet, that person rationally would believe that the shooter was still out to kill her and might have better aim the next time. On the other hand, if one simply receives a threatening note with no other action, it would be hard to predict future violence on that basis alone (perhaps depending on what the note said). Perez asserts that his case presents a situation that lies at or near the "actual torture" end of the spectrum; it would have been completed torture if luck and fleet feet had not averted disaster.

With this construct in mind, Perez argues that the immigration service failed to make sufficient findings about whether he would have been tortured in 2003 if he had not escaped MS-13's recruitment efforts, or in 2010 had he not

been able to flee from the gang members. He suggests that evidence of a narrow escape from torture is as good as evidence of actual past torture for purposes of 8 C.F.R. § 1208.16(c)(3)(i). Both types of evidence, in his view, support the same prediction for the key inquiry under the CAT: the likelihood of future torture. Thus, he concludes, to comply with § 1208.16(c)(3)(i), the immigration service needed to determine whether he would have been tortured by MS-13, and it committed legal error by failing to give adequate weight to his narrow escapes.

Perez overstates his case, but at its core his argument has more merit than the Board thought. We do not need to, and do not, literally equate a narrow escape from torture with actual torture, as such an equation would not be consistent with the definition of torture under Article 1.1 of the CAT[1] or the implementing regulations found in 8 C.F.R. § 1208.18(a)(1), which largely replicate the CAT language. Nevertheless, an escape from torture at the hands of the state or someone who the state cannot or will not control is strong evidence supporting a prediction of torture should the target be returned to that country. Such evidence is particular to the petitioner; it

---

[1] That language is as follows: "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."

indicates the methods likely to be used; it identifies who the perpetrator(s) will be; and it sheds light on the state of mind of the potential torturer.

Perez should have been given the opportunity to show that, at MS-13's hands, in the earlier situations he would have experienced severe physical or mental pain or suffering, inflicted for a particular purpose, and at the instigation of or with the consent or acquiescence of a public official. 8 C.F.R. § 1208.18(a), and that this points to a serious risk of torture on his return to Honduras. We grant that any inquiry about the future requires some speculation, but that problem is baked into the Convention and § 1208.16(c)(3). The fact that Perez was the target of some near-misses, however, shows that MS-13 had Perez himself in its sights and was willing to take violent action against him. The threat of imminent death is one way in which torture by means of mental pain or suffering can be inflicted. 8 C.F.R. § 1208.18(a)(4)(iii).

B

Perez also argues that the Board erred by failing to consider whether, after relocation, he would have to hide the fact that he has resisted MS-13. He acknowledges that the Board did evaluate whether he "would be able to avoid the *particular* MS-13 members he had previously confronted." (Emphasis added.) Perez contends, however, that this was not enough, and that our case law has consistently required "the Board [to] ask whether [a CAT applicant] could live safely after 'openly' admitting the qualities that exposed him to danger." See *Velasquez-Banegas v. Lynch*, 846 F.3d 258, 262–63 (7th Cir. 2017); *N.L.A. v. Holder*, 744 F.3d 425, 442 (7th Cir. 2014) (in context of asylum and withholding of removal); *Sarhan v. Holder*, 658 F.3d 649, 661 (7th Cir. 2011). As evidence of the danger of MS-

13 to him throughout Honduras, he points to his mother's letter, his testimony, and that of his wife, sister, and cousin, who testified about gangs' extensive reach in Honduras. These witnesses all testified about their fear that he would be killed in Honduras no matter where he settled.

Perez is correct that the Board erred by examining only the threat from the same MS-13 gang members who previously confronted him and failing to consider his evidence that MS-13 (whether through the same or different representatives) would endanger him in the areas of Honduras outside of Danli. The Board said only that it was "not persuade[d]" that "if he remains fearful of those who harmed or threatened him in the past, he would be unable to relocate in Honduras to avoid those threats." As a result, the Board did not comply with 8 C.F.R. § 1208.16(c)(3)(ii)'s requirement that it consider all evidence relating to whether a CAT applicant can relocate safely within the proposed country of removal. See *Piescha-con-Villegas v. Attorney Gen. of U.S.*, 671 F.3d 303, 313–14 (3d Cir. 2011); *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011).

Although we theoretically could look to the IJ's opinion to fill in this important omission from the Board, see *Orellana-Arias*, 865 F.3d at 489, we find that option unsatisfactory here. The IJ made a perfunctory statement to the effect that "[t]he record does not indicate that the reach of these gangs is absolute throughout Honduras or that they would learn of [Perez's] whereabouts were he to return," but he offered no explanation for this conclusion and mistakenly said that the country of return would be *Mexico*, not Honduras. Under the circumstances, this is not enough to fill the gap in the Board's reasoning.

We conclude that the Board must take another look at Perez's evidence that relocation is not an option for him, because MS-13 members outside of Danli would torture him in Honduras.

### III

The IJ and the Board failed to make an adequate inquiry into Perez's near-escapes from MS-13's clutches and thus failed properly to include this factor in the mix when they made their prediction about the risk of torture Perez would face if returned to Honduras. The Board also erred when considering Perez's evidence that he could not relocate safely within Honduras, by too narrowly focusing on his exposure to particular MS-13 members rather than the gang as a whole. We therefore GRANT Perez's petition for review.