In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2334

EL HADJ HAMIDOU BARRY,

*Petitioner*,

*v.*

WILLIAM P. BARR,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A205-830-004.

ARGUED NOVEMBER 9, 2018 — DECIDED FEBRUARY 22, 2019

Before BAUER, BRENNAN, and SCUDDER, *Circuit Judges*.

BRENNAN, *Circuit Judge*. El Hadj Hamidou Barry, a native and citizen of Guinea, applied for deferral of his removal from the United States under the United Nations Convention Against Torture. An immigration judge denied Barry's application because Barry failed to show if removed to Guinea he likely would be tortured. The Board of Immigration Appeals affirmed. Barry now petitions this court for review, claiming

if removed to Guinea he will be tortured because of his political and familial affiliations and his sexual orientation. Barry has failed to satisfy his burden to substantiate these claims with evidence, so we deny his petition.

**I.**

Barry was born and grew up in Guinea. His father was a member of the Union for New Republic ("UNR"), an opposition political party in Guinea during the 1990s. In the past, the Guinean government—controlled by the ruling political party at that time—took drastic measures to locate Barry's father and prevent his political activities. Barry testified at his immigration hearing that Guinean soldiers showed up at his home when he was eight years old, stabbed him in the thigh with a machete, and threatened to cut off his leg to elicit his father's whereabouts from his mother. When his mother did not comply, the soldiers beat her, too. Barry's mother testified before the immigration judge in support of Barry's application for deferral under the Convention Against Torture ("CAT"), reiterating the incident with the soldiers as Barry described it. Barry is no longer in touch with his father and has no current affiliation with any Guinean political party, including the UNR. Moreover, a different political party with a new president is now in power in Guinea.

In 1998, shortly after the incident with the soldiers, Barry and his mother left Guinea and arrived in the United States. Barry was admitted as a temporary visitor. Having never returned to Guinea, he is now thirty years old and has been living in the United States for over twenty years. Around 2009, Barry committed various crimes, including robbery, controlled substances offenses, and possession of a firearm.

He was convicted and sentenced for an aggravated felony conviction of conspiracy to commit robbery.

The Department of Homeland Security issued Barry a Final Administrative Removal Order under 8 U.S.C. § 1228(b) based on his felony conviction. Barry applied for deferral of removal under Article 3 of CAT, 8 C.F.R. § 1208.17.[1] He also sought and was afforded a reasonable fear interview with an asylum officer. During the interview, he expressed fear of being tortured if returned to Guinea due to his father's past political affiliations and his sexual orientation. The asylum officer referred Barry's case to the Chicago Immigration Court, and an immigration judge held a hearing to assess the merits of Barry's deferral claim.

Barry and his mother testified at the hearing. They each described the soldier stabbing incident, the country conditions in Guinea, and Barry's bisexuality. Barry testified that when he was a sophomore in high school, he was told anecdotally by "another African guy" that Guinean civilians have tortured and beaten to death gay men living in Guinea. Barry explained while there have not been any reported incidents of Guinean police prosecuting homosexuals under Guinean laws criminalizing homosexual activity, he believes most homosexual behavior is not reported to the police because Guinean civilians routinely administer "street justice" to gay individuals.

---

[1] Barry also requested withholding of removal under the Immigration and Nationality Act § 241 (b)(3), *see* 8 U.S.C. § 1231(b)(A), but at his hearing conceded his conviction for conspiracy to commit robbery constitutes a "particularly serious crime," making him ineligible for withholding. *See* 8 U.S.C. § 1231(b)(3)(B)(ii); *see also* 8 C.F.R. § 1208.16(d)(2).

Barry married an American woman, Amber Johnson, in April 2017. At his immigration hearing, he testified he had relationships with "five to six" men before meeting his wife and, despite marrying Amber, has continued to pursue sexual relations with men. Based on his plan to maintain extramarital sexual relations in the future, he believes "regular civilians" in Guinea will be able to discover his sexuality and "attack [him], … torture [him], kill [him]" and "beat [him] to death."

Barry's mother testified she learned of Barry's bisexuality when he was in high school. She expressed her fear that Barry could be killed in Guinea if people learned of his sexual orientation, recounting she had seen gay people chased through the streets in Guinea and "beaten up … because they were gay." Her testimony about the conditions homosexual individuals encounter in Guinea is based on her experiences in Guinea approximately twenty years ago.

Barry also submitted record evidence in support of his and his mother's testimonies. The most notable evidence included summonses for his parents to appear, purportedly issued by a Guinean court, and a U.S. State Department country report describing conditions in Guinea as politically violent and hostile toward homosexual individuals. The summonses are dated April 20, 1998 and April 7, 2016, and the country report was produced in 2016.

The immigration judge found Barry and his mother to be credible witnesses, but denied Barry's application for CAT deferral because Barry failed to meet his burden of producing evidence that if removed to Guinea he more likely than not would be tortured. Specifically, the immigration judge determined "the bulk of the evidence" about Barry being

tortured because of his bisexuality comes from Barry's mother, who has not been to Guinea in approximately twenty years. Although the country report does not contradict Barry's mother's testimony, it explains only generally that Guinea criminalizes same-sex sexual conduct and describes generalized violence toward gay individuals rooted in "religious and cultural taboos." As the judge noted, "there's been [no known] prosecutions or reports of arrest" in Guinea under the country's laws prohibiting homosexual acts. The judge also determined the evidence about Barry being tortured because of his father's past political affiliations largely consists of decades-old memories and events. Even assuming Barry and his mother accurately depicted the incident with the soldiers, the judge found no evidence that future incidents would occur.

Barry timely appealed the immigration judge's decision to the Board of Immigration Appeals ("BIA"). On May 31, 2018, BIA dismissed the appeal and affirmed the immigration judge's removal order. Barry now petitions this court for review.

## II.

An applicant seeking deferral of removal under CAT bears the burden of establishing it is "more likely than not that he or she would be tortured" in the proposed country of removal. 8 C.F.R. §§ 1208.16(c)(2)–(3), 1208.17(a). This court "interpret[s] that standard liberally, requiring 'a substantial risk that a given alien will be tortured if removed from the United States.'" *Bernard v. Sessions*, 881 F.3d 1042, 1047 (7th Cir. 2018) (quoting *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1136 (7th Cir. 2015)); *see Perez v. Sessions*, 889 F.3d 331, 334 (7th Cir. 2018) (noting that this court applies the "more likely than

not" standard under a "substantial risk" analysis). For purposes of CAT protection, there must be some showing that the potential torture will be committed by the government of the removal country, either directly or by acquiescence. *Bernard*, 881 F.3d at 1047 (quoting *Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016)); *see also Lozano-Zuniga v. Lynch*, 832 F.3d 822, 830 (7th Cir. 2016) ("An applicant for CAT protection must demonstrate that the torture was inflicted by or at the behest of, or with the consent or acquiescence of, a public official.").

When evaluating whether an applicant has met this burden, "the immigration judge must address various factors such as evidence of past torture, ability to relocate within the country, evidence of grave human rights violations or other relevant country conditions." *Orellana-Arias v. Sessions*, 865 F.3d 476, 489 (7th Cir. 2017); *see* 8 C.F.R. § 1208.16(c)(3)(i)–(iv). "Evidence of generalized violence is not enough; the [immigration judge] must conclude that there is a substantial risk that the petitioner will be targeted specifically." *Bernard*, 881 F.3d at 1047 (citing *Lozano-Zuniga*, 832 F.3d at 830–31); *Lopez*, 810 F.3d at 493.

When, as here, BIA relies on the immigration judge's findings and adds its own analysis, this court reviews the immigration judge's decision as supplemented by BIA's additional reasoning. *Bernard*, 881 F.3d at 1046 (quoting *Jabateh v. Lynch*, 845 F.3d 332, 337 (7th Cir. 2017)). The court reviews a "denial of CAT deferral under the highly deferential substantial evidence test and will reverse only if the record evidence compels a contrary conclusion." *Bernard*, 881 F.3d at 1047 (quoting *Lopez*, 810 F.3d at 492 (internal citations omitted)); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 n. 1 (1992)

("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it … "); *Jabateh*, 845 F.3d at 337 (explaining that the court "may reverse the [immigration judge's factual] determinations 'only if we determine that the evidence compels a different result'" (quoting *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011))).

Here, the evidence does not compel the conclusion that Barry more likely than not will be tortured by or with the acquiescence of Guinean officials. At his immigration hearing, Barry relied primarily on three sources of evidence: (1) the testimony of he and his mother about his bisexuality and conditions in Guinea twenty years ago, (2) summonses purportedly issued by a Guinean court for his parents' appearances, and (3) a U.S. State Department country report describing conditions in Guinea as politically violent and hostile toward homosexual individuals.

Certainly, the testimony before the immigration judge indicates Barry suffered great harm as a child at the hands of Guinean soldiers. Whether that harm rose to the level of torture was, ultimately, not a factual determination the immigration judge needed to make. After reviewing the entire record and finding Barry and his mother credible, the immigration judge determined Barry's fear of *future* torture was "too speculative" and did not meet the "more likely than not" standard. The immigration judge must consider potential past torture in the context of the entire record; past torture alone is not dispositive. 8 C.F.R. §1208.16(c). BIA reviewed the immigration judge's findings and agreed. The evidence does not compel us to conclude differently.

Barry and his mother left Guinea over twenty years ago. Neither have been back to the country since, and neither seem

to have maintained any familial or political ties to the country. Barry and his mother testified they are no longer in touch with Barry's father, whose political activities gave rise to the abuse Barry and his mother suffered twenty years ago. As the country report explains, a different political party controls Guinea today than the one that commissioned soldiers two decades ago to find Barry's father.

To support his assertion that the Guinean government is still looking for his father, Barry submitted Guinean court summonses for his parents from 1998 and 2016. When the immigration judge asked Barry about their origin, Barry could not authenticate them, nor could he explain how he obtained them or why they were issued. He did not argue at that time that he lacked an opportunity to authenticate the documents, nor did he object to the immigration judge affording them limited evidentiary weight. Indeed, it was consistent with this court's precedent for the immigration judge to do so. *See Raghunathan v. Holder*, 604 F.3d 371, 380 (7th Cir. 2010) (giving little weight to an affidavit by a respondent's mother because it was unauthenticated and the respondent failed to explain how he had obtained it).

Even if Guinean officials are still looking for Barry's father, it is speculation to assume they are looking for Barry or would connect Barry to his father. Barry testified the Guinean government would know he is his father's son because they share a surname. But he failed to lay a foundation for this assertion (for example, by providing evidence how common the surname "Barry" is in Guinea). No record evidence substantiates Barry's fear his father's political affiliations will imperil him.

Barry also testified he would be tortured in Guinea because he is bisexual. His testimony describing present-day treatment of gay men in Guinea is based on a friend's hearsay comment from approximately thirteen or fourteen years ago. The friend's comment is uncorroborated, aside from Barry's mother testifying she recalls gay individuals being beaten when she lived in Guinea approximately twenty years ago. Such dated testimonial evidence fails to establish a substantial risk of torture in Guinea today. *See, e.g., Bernard*, 881 F.3d at 1046 (evidence that consists mostly of "decades-old memories" does not establish a CAT claim for relief).

In addition to outdated, the friend's comment indicates only that Guinean *civilians* may mistreat gay men; it would not show that the Guinean *government* tortures individuals based on sexual orientation or systematically turns a blind eye toward such mistreatment. *See Silais v. Sessions*, 855 F.3d 736, 742 (7th Cir. 2017) (violence committed by private individuals may constitute persecution only if the foreign government was complicit in those acts or was unable or unwilling to take steps to prevent them). While Guinean laws criminalize homosexual activities, Barry did not know of a single individual ever prosecuted for homosexuality in Guinea, and he admitted the country report contains no evidence of any homosexuality-based prosecutions.

The country report explains there are "[d]eep religious and cultural taboos against same-sex sexual conduct" in Guinea and that same-sex sexual activity is illegal. The report does not, however, describe any individual being tortured for engaging in homosexual activity. Further, the report contains only generalized findings insufficient to satisfy Barry's burden of showing he is personally subject to a particularized

risk of torture. *See Lozano-Zuniga*, 832 F.3d at 830–31 ("[E]vidence about generalized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *see also Lenjinac v. Holder*, 780 F.3d 852, 856 (7th Cir. 2015) ("[R]eports that torture occurs in a foreign country … are insufficient bases for relief without evidence that the *petitioner* will be tortured if he returns."); *Rashiah v. Ashcroft*, 388 F.3d 1126, 1133 (7th Cir. 2004).

### III.

Barry has failed to establish he more likely than not will be tortured if removed to Guinea. The immigration judge assessed the record and denied Barry's deferral application. BIA reviewed the immigration judge's findings and affirmed. The evidence does not compel this court to conclude otherwise.

The petition for review is DENIED.