In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 16-1874

JOSE ORELLANA-ARIAS,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III,
Attorney General of the United States,

*Respondent*.

———————————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A078-678-415.

———————————

ARGUED NOVEMBER 10, 2016 — DECIDED JULY 25, 2017

———————————

Before RIPPLE, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Jose Orellana-Arias is a native and citizen of El Salvador. Immigration officials detained him and took him into custody as he entered the United States near McAllen, Texas in April 2013. This was not his first time entering the United States without being admitted or paroled. In spring 2001, he came to the United States, but border patrol agents stopped him, and after the Department of

Homeland Security prevailed in immigration proceedings, he was removed to El Salvador on October 3, 2001. In 2007, he returned to the United States again to find work to allow him to provide for his family in El Salvador and this time was able to stay and work undetected from 2007 through December 2011, when he returned to his family.

Orellana-Arias testified that while he was in the United States, his wife informed him that gang activity and crime had increased significantly during his time away. Approximately one month after returning to El Salvador, on his way home from work, three masked men confronted him. Orellana-Arias recognized the men from their voices and knew that they were neighborhood members (along with a leader) of the gang MS-13 who were believed to be behind the deaths of people in the neighborhood. The men threw him to the ground, kicked him, tried unsuccessfully to steal his shoes, and successfully stole his phone and money. One suggested that they kill Orellana-Arias, but he pleaded for his life and managed to run away. During the incident, Orellana-Arias twisted his ankle but did not receive any medical care as a result of the attack other than taking pills he received from a pharmacy.

Two days later the same men approached Orellana-Arias as he bathed in a pond and suggested that he contribute $5,000 to the MS-13 gang. When Orellana-Arias stated he did not have the money, the gang members insisted that he must, as he had just returned from the United States. They threatened that he would "disappear" if he did not comply. Orellana-Arias negotiated with the men and, in the end, paid them $500. Following this incident, the gang members extorted money from Orellana-Arias on a number of occasions,

and each time they demanded money, he gave them what-ever he had on hand—anywhere from $1–$5. On one occa-sion they stopped Orellana-Arias to remind him to call a number they had given him to report any sightings of police officers.

To escape the extortion and fear, in April 2012, Orellana-Arias fled back to the United States where he was arrested at the border and detained for 45 days before being removed once again. Back in his home town, the demands by MS-13 gang members continued. Gang members commanded Orel-lana-Arias to call them whenever he saw the police and they entered a phone number into his cell phone such that he would also be suspected of being in the gang if stopped by the police. Orellana-Arias testified that he refused to comply with the demand to act as a lookout if he saw the police, as it conflicted with his morals. He also did not report his en-counters to the police, believing from seeing gang members go free after arrest, that the police would be of no help.

In October 2012, three men in civilian clothes shot at Orellana-Arias as he tried to escape them. They later identi-fied themselves as police officers and stated that they were looking for two of the gang members who had once assault-ed Orellana-Arias. They handcuffed Orellana-Arias and re-viewed the numbers in his cell phone, but took no action against him. Orellana-Arias noticed that the men the police were looking for were never arrested, confirming his belief that the police were unable or unwilling to protect him from future harm by gang members.

In February 2013, these same gang members, along with two others, again approached Orellana-Arias, asked him if he had seen the police, and again gave him a number to call

should he see the police in the future. That same month, Orellana-Arias heard that members of MS-13 killed two bus drivers who drove a route through his town after they failed to pay demanded extortion fees. These events prompted Orellana-Arias to flee the escalating violence and gang activity that he perceived as infecting the entire country. He arrived in McAllen, Texas in April 2013, where immigration officials took him into custody. While Orellana-Arias was in custody, gang members twice approached his wife—once at home and once on the street—asking his whereabouts. The gangs did not contact his wife thereafter and none of Orellana-Arias's family members have been physically harmed by the gangs.

After being detained following his April 2013 reentry, Orellana-Arias requested a reasonable fear interview with the asylum office in Chicago. The asylum officer determined that Orellana-Arias did not have a reasonable fear of persecution or torture. Yet upon Orellana-Arias's request, the case was transferred to an immigration judge who found that Orellana-Arias did indeed have a reasonable fear of returning to El Salvador and vacated the asylum officer's underlying decision, thus allowing Orellana-Arias to apply for withholding of removal and Convention Against Torture protection.

On October 16, 2013, Orellana-Arias appeared before a different immigration judge by televideo. He testified regarding his interactions with and fear of gang members in El Salvador, including the facts we have recounted above. He testified that he feared that he would be kidnapped and killed in El Salvador, that he has religious and moral objections to gangs, and that he did not believe there was any

other part of El Salvador to which he could relocate safely. Along with his testimony, the immigration judge considered affidavits of family members and experts, and many articles on gang activity in El Salvador. The immigration judge denied the applications and Orellana-Arias waived his right to appeal.

Shortly thereafter, Orellana-Arias filed an unopposed motion to reconsider, stating that he wished to withdraw his waiver of appeal. The Board, granting the motion, remanded the case back to the immigration judge for preparation of a written decision. In her September 4, 2014 decision, the immigration judge found that Orellana-Arias was credible, but that he had not demonstrated that the mistreatment he suffered previously in El Salvador rose to the level of past persecution as opposed to mere harassment, and that the risk of future mistreatment was too speculative to constitute a clear probability of future persecution. Finally, the immigration judge determined that Orellana-Arias did not establish a nexus between any protected ground and alleged harm. The proposed group of "young Salvadoran males who oppose gang and other criminal activities due to their religious and/or moral beliefs," the immigration judge found, was not "sufficiently particular" because the core attribute is opposition to gangs, likely a common attribute held by every Salvadoran citizen who is not a member of a gang. R. 136. She then ruled that even if the group was cognizable, Orellana-Arias offered no evidence that the gang had any knowledge of his beliefs and opposition to the gang. Similarly, she held that the social group of "Salvadorans who have lived in the United States for many years and who are perceived by drug cartels, criminal organizations, gangs, and corrupt government officials to have money upon their return to El Salva-

dor" was likewise not sufficiently particular to be cognizable. *Id.* The judge found that the record evidence did not support Orellana-Arias's assertion that he faced a more particularized risk than others because he lived in the United States. Finally, the immigration judge found that Orellana-Arias had not met his burden for CAT protection—that is, he did not experience past torture, and any fear of future torture was too speculative to warrant protection under CAT.

Following the immigration judge's decision, Orellana-Arias's case wound through a series of procedural snafus that we relegate to a footnote for the sake of efficiency.[1] Once back on track, on March 24, 2016, the Board issued a decision denying Orellana-Arias's appeal. The Board's decision concluded that Orellana-Arias had not established past persecution or that he faced a clear probability of future persecution on account of his membership in a social group of young Salvadoran males who oppose gang membership and other criminal activities due to their religion and/or moral beliefs. The Board concluded that the group has not been shown to

---

[1] After the immigration judge certified the record back to the Board, on November 13, 2014, the Board dismissed the appeal without issuing a briefing schedule. R. 122. On December 15, 2014 Orellana-Arias filed a motion for reconsideration with the Board, arguing that it was procedural error to dismiss the appeal without briefing. The Department did not oppose the motion for reconsideration and the Board granted the motion. R. 90. At the same time that Orellana-Arias filed a motion for reconsideration with the Board, he filed a petition in this court for review of the Board's November 13, 2014 decision. See *Orellana-Arias v. Holder*, No. 14-3712, R. 1. After the Board reopened his removal proceedings, this court granted Orellana-Arias's voluntary dismissal of his motion. *Id.* at R. 7.

be cohesive and socially distinct in El Salvador, and that it was too loosely defined to meet the requirement of particularity because it is overbroad. The Board also concluded that Orellana-Arias had not established past persecution or that he faced a clear probability of future persecution on account of his membership in a social group of individuals who are perceived by drug cartels, criminal organizations, gangs, and corrupt government officials to have money because they are returning from the United States. The Board again concluded that it was not sufficiently distinct or defined with sufficient particularity. Finally, the Board concluded that Orellana-Arias had failed to meet the nexus requirement, that is, that he was targeted on account of his membership in either of these two social groups. The Board pointed out that "gangs and other criminal elements target anyone who could provide them with money, goods or services." R. 4.

Moving on to the CAT appeal, the Board concluded, in one sentence, that Orellana-Arias "did not meet his burden of proof to establish that it is more likely than not that he will be tortured by or with the instigation of or with the consent or acquiescence (including willful blindness) of a public official or other person acting in an official capacity in El Salvador." *Id.*

Orellana-Arias objects to the conclusions of the immigration judge and Board, asserting that he did indeed demonstrate past persecution, that both of his proposed social groups are cognizable under the Immigration and Nationality Act, that he was targeted because of his membership in those groups, that he established a clear probability of future persecution, and that he warranted protection under the

Convention Against Torture. We review the decision of the immigration judge as supplanted by the Board, reviewing the legal conclusions de novo and the factual conclusions to determine whether they are supported by substantial evidence. *Dominguez-Pulido v. Lynch*, 821 F.3d 837, 841 (7th Cir. 2016). The standard of review is a deferential one in which we "uphold the Board's determination if it is supported by substantial evidence—that is, reasonable, substantial, and probative evidence on the record considered as a whole." *Cece v. Holder*, 733 F.3d 662, 669 (7th Cir. 2013) (en banc). We overturn the Board's decision only if the record compels a different result. *Tapiero de Orejuela v. Gonzalez*, 423 F. 3d 666, 671 (7th Cir. 2005).

Although the Board discussed the cognizability of the proposed social groups, we need not, as we agree with the Board's secondary assessment that even if the two proposed groups are cognizable as social groups under the Immigration and Nationality Act, Orellana-Arias has not provided sufficient evidence establishing that he was targeted on the basis of his membership in either social group. In other words, in order to determine whether a petitioner has been persecuted based on membership in a social group, the adjudicating court must determine both whether the group constitutes a social group under the Act and whether the petitioner has established a nexus between the persecution and the membership in the social group. *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 827 (7th Cir. 2016). In this case, both the Board and immigration judge determined that there was no nexus and we agree, thus making it unnecessary to determine

whether the social groups defined by Orellana-Arias were cognizable under the Act.[2]

To be eligible for asylum, an applicant bears the burden of demonstrating that he is "unable or unwilling to return" to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In this case, Orellana-Arias claims that he was and will be persecuted because of his membership in the two social groups set forth above. A petitioner for asylum can meet his burden by proving either past persecution or well-founded fear of future persecution. *Dominguez-Polido*, 821 F.3d at 844. An applicant who successfully proves that she was subject to past persecution is presumed to have a well-founded fear of future persecution, which the Attorney General can rebut by demonstrating a change in conditions in the applicant's home country. *Cece*, 733 F.3d at 668; 8 C.F.R. § 1208.13(b)(1). Applicants who base their claim on membership in a social group must demonstrate that the group to which they belong is defined by a characteristic or characteristics that are either immutable or so fundamental that a person ought not be required to change. *Cece*, 733 F.3d at 669. And, importantly for this case,

---

[2] Despite this conclusion, however, we note parenthetically that the parties spend much time discussing the Board's conclusion that Orellana-Arias' proposed social groups were overly broad and not sufficiently particularized. As we have noted time and again, in this circuit we reject the notion that the breadth of a social category per se makes it non-cognizable under the Act. *Cece*, 733 F.3d at 674; see also *Gutierrez v. Lynch*, 834 F.3d 800, 805 (7th Cir. 2016); *N.L.A. v. Holder*, 744 F.3d 425, 438 (7th Cir. 2014).

the applicant "must establish a 'nexus' between any past or feared harm and that membership. In other words, the petitioner must show that he or she is persecuted on account of membership in a particular social group." *Dominguez-Pulido*, 821 F.3d at 844–45 (internal citations omitted).

Orellana-Arias did not present sufficient evidence that he was targeted on the basis of his membership in a group of individuals who are perceived by drug cartels, criminal organizations, gangs, and corrupt government officials to have money because they are returning from the United States. The gangs appeared to have targeted Orellana-Arias to fill their coffers with his money, but there is no evidence that he was targeted based on the fact that he was perceived to have money because he was returning from the United States. Although it is true that the gang mentioned his return from the United States when it first approached him asking for money, Orellana-Arias provided no evidence that he was more of a target because he was deported from the United States then he would have been had he returned from, for example, Qatar, Luxembourg, Brunei or any other country perceived to be wealthy, or had he won the lottery, inherited a large estate, secured a high-paying job, or discovered a diamond mine in his backyard. Moreover, after that initial extortion, in which Orellana-Arias stated that he gave the gang all the money he had available, the fact of his return from the United States dropped out of the equation. In other words, it was simply Orellana-Arias's perceived wealth alone that made Orellana-Arias a target for the gang. Our prior decisions have held that "wealth, standing alone, is not an immutable characteristic of a cognizable social group." *Dominguez-Pulido*, 821 F.3d at 845 (citing *Tapiero de Orejuela*, 423 F.3d at 672). Specifically, in *Dominguez-Pulido* we

held that the social group of individuals deported from the United States who have money or are perceived to have money and who have family members in the United States who could pay a ransom "is not cognizable as a ground for protection because its primary characteristic is wealth or perceived wealth … [and the petitioner's] attempt to narrow his proposed group by adding the trait of 'being deported from the U.S.' does not render his group cognizable. " *Dominguez-Pulido*, 821 F.3d at 845; see also *Lopez v. Sessions*, No. 17-1047, 2017 WL 2543346, at *3, 859 F.3d 464 (7th Cir. June 13, 2017); *Gutierrez*, 834 F.3d at 806 (concluding that the social group of people who have money or are perceived to have money is not a cognizable social group, even when the characteristic of having been deported from the United States is added); But see *Gutierrez*, 834 F. 3d at 807–808 (Posner, J. concurring) (arguing that the fact that wealth is not an immutable characteristic is not reason to deny a social grouping in asylum cases as wealth rarely stands alone and moreover, "having or being thought to have wealth is in an important *practical* sense 'immutable.'") and *Lozano-Zuniga*, 832 F.3d at 828 (expressing a lack of certainty as to whether the group of "recent deportees from the United States who might be perceived to have money" is a cognizable social group but finding it unnecessary to resolve). The concurring opinion in *Gutierrez* raises significant concerns about whether perceived wealth is an immutable characteristic but, in any event, in this circuit we have determined that wealth alone is not cognizable as a social group. And we are not alone in finding that wealth alone, or even wealth along with deportation from the United States are not characteristics that are cognizable as a social group under the Act. See *Beltrand–Alas v. Holder*, 689 F.3d 90, 94 (1st Cir. 2012) (neither

wealth alone nor perceived wealth upon returning from the United States can form the basis for a cognizable social group); *Ucelo–Gomez v. Mukasey*, 509 F.3d 70, 72–74 (2d Cir. 2007) (wealth alone cannot form the basis of a social group); *Faustov v. Attorney Gen.*, 538 F. App'x 166, 168 (3d Cir. 2013) (perceived wealth cannot form the basis of a cognizable social group); *Temu v. Holder*, 740 F.3d 887, 895 (4th Cir. 2014) (affluence alone cannot be basis of social group); *Gonzalez-Soto v. Lynch*, 841 F.3d 682, 684 (5th Cir. 2016) (neither wealth alone nor perceived wealth upon return from the United States are recognized as social groups); *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (perceived wealth after return from working in the United States is not a characteristic that can form the basis of a social group); *Matul–Hernandez v. Holder*, 685 F.3d 707, 712–13 (8th Cir. 2012) (individuals returning from United States and perceived as wealthy do not constitute a recognized particular social group); *Ramirez-Munoz v. Lynch*, 816 F.3d 1226, 1229 (9th Cir. 2016) (people perceived as wealthy Americans is not a discrete class of persons recognized by society as a particular social group); *Delcid-Zelaya v. Holder*, 534 F. App'x 694, 698 (10th Cir. 2013) (perceived wealth based on return from United States does not constitute a social group); *Ilyukhin v. U.S. Atty. Gen.*, 489 F. App'x 331, 334 (11th Cir. 2012) ("wealth and perceived ability to pay bribes is not the sort of attribute that is fundamental to a person's individual identity sufficient to comprise a particular social group."). More importantly, a person claiming that he is targeted because of his perceived wealth having returned from the United States, must submit evidence supporting that claim (*Rivera v. Lynch*, 845 F.3d 864, 865 (7th Cir. 2017)), and Orellana-Arias has failed to do that.

As for Orellana-Arias's proposed social group of "young Salvadoran males who oppose gang membership and other criminal activities due to their religious and/or moral beliefs," we need not opine on the cognizability of that group either. As the immigration judge pointed out, nothing in the record before the immigration court suggested that the gang members knew about Orellana-Arias's moral or religious objection to gangs. Orellana-Arias had not voiced any such concern or made any of his positions public. Although he did refrain from reporting police activity to the gang members, as they instructed him to do, it is not clear that the gang members would have perceived his lack of reports to be the result of his opposition to gang activity as opposed to mere failure to witness any relevant police activity. And without any knowledge of his religious or moral opposition to gangs, it cannot be said that the gang targeted Orellana-Arias on account of his membership in such a group.

We conclude that Orellana-Arias did not meet his burden of demonstrating a nexus between the alleged persecution and his proposed social groups of wealthy deportees or gang resisters. But even were this not so, Orellana-Arias's petition was properly denied for failing to demonstrate either past persecution or a well-founded fear of future persecution.

The burden of establishing past persecution or a fear of future persecution falls to the petitioner. 8 U.S.C. §§ 1229a(c)(4)(A)(i), § 1231(b)(3)(C). Persecution "must rise above mere harassment," and can include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture," or behavior that threatens the same, and "non-life-threatening behavior such as torture and economic depriva-

tion if the resulting conditions are sufficiently severe," *Velasquez-Banegas v. Lynch*, 846 F.3d 258, 270–71 (7th Cir. 2017). However, "generalized conditions of hardship which affect entire populations do not rise to the level of persecution." *Id.*

In this case, the gang attacked Orellana-Arias, throwing him to the ground, kicking him and twisting his ankle. Our precedent informs that minor injuries such as these, albeit traumatic, do not rise to the level of persecution. "Persecution involves, we suggest, the use of *significant* physical force against a person's body, or the infliction of comparable physical harm without direct application of force." *Tsegmed v. Sessions*, No. 16-1036, 2017 WL 2588881, at *3, 859 F.3d 480 (7th Cir. June 15, 2017) (emphasis in original). Mere harassment will not suffice. *Velasquez-Banegas*, 846 F.3d at 270. See *Nzeve v. Holder*, 582 F.3d 678, 684 (7th Cir. 2009) (blister and bruises from attack does not compel finding of past persecution); *Mema v. Gonzales*, 474 F.3d 412, 416–18 (7th Cir.2007) (abduction at gunpoint followed by detention and physical abuse, resulting in petitioner losing consciousness, did not compel conclusion that petitioner suffered past persecution); *Zhu v. Gonzalez*, 465 F.3d 316, 319–20 (7th Cir. 2016) (beating, including being hit on the head with a brick resulting in cut requiring seven stitches, did not compel finding of persecution); *see also Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir. 2003) (record did not compel conclusion that petitioner suffered persecution based on a single incident where he was detained and deprived of food for three days and was "beaten to the extent that his face became 'swollen'" because petitioner needed to provide more detail).

As the immigration judge pointed out, the death threats are more troubling, but Orellana-Arias bought off the gang

members with small payments, and other than the minor physical injury in the first interaction, they appeared content to leave him physically unharmed each time thereafter despite his failure to meet their high monetary demands and despite the fact that he never participated as a police lookout as they requested. No one in his immediate family was threatened with death or physical injury due to his failure to meet the gang's demands. The immigration judge found that the threats simply were not credible or imminent. R. 133. The facts do not compel us to conclude otherwise.

The economic hardship posed to Orellana-Arias and his family from this extortion cannot be ignored, but we cannot say that the immigration judge erred by concluding that the economic harm did not rise to the level of persecution. Economic harm can indeed rise to the level of persecution if it is deliberately imposed as a form of punishment and it results in sufficiently severe deprivations. *Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006). But, as we have noted, our immigration laws do not allow for grants for asylum for generalized conditions of crime and poverty within a nation. *Velasquez-Banegas*, 846 F.3d at 270. This case highlights the dire circumstances that many people around the world face from drugs, gangs, crime, and poverty. El Salvador has one of the highest crime rates in the world. See *Rivera*, 845 F. 3d at 866. "But persecution is not so broad a concept as to encompass all that we regard as 'unfair, unjust, or even unlawful or unconstitutional'" and does not include within its parameters "unpleasant or even dangerous conditions in [the applicant's] home country " or "[g]eneral conditions of hardship that affect entire populations." *Ahmed*, 467 F.3d at 673 (internal citations omitted). An applicant for asylum must present

evidence of how safe or unsafe he personally will be in El Salvador. *Rivera*, 845 F.3d at 866.

Orellana-Arias states that we defined persecution in *Tapiero de Orejula* to include repeated attempts at extortion and various death threats. See Brief of Petitioner at 16 (citing *Tapiero de Orejula*, 423 F.3d at 673). But he neglects to include the fact that we found persecution of that family where the gang repeatedly attempted to extort the family, made multiple death threats, and actually followed up those threats by murdering the family patriarch. *Tapiero de Orejula*, 423 F.3d at 673. Here of course, and thankfully, there was no actual murder of a family member lending credence to the naked threats. Orellana-Arias has not met his burden of demonstrating past persecution.

An applicant who has not demonstrated past persecution but who still seeks asylum, must demonstrate a clear probability of future persecution "because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Orellana-Arias must show a clear probability of persecution if removed to El Salvador, that is, that it appears more likely than not that he will suffer persecution if removed. *Musa v. Lynch*, 813 F.3d 1019, 1023 (7th Cir. 2016); 8 C.F.R. § 1208.16(b)(2).

The immigration judge's determination that Orellana-Arias failed to establish that there was a clear probability that he would be subject to future danger because of his membership in these social groups was supported by reasonable and substantial evidence. A petitioner must set forth specific, detailed evidence indicating that it would be more likely than not that he would be individually targeted for harm. *Lozano-Zuniga*, 832 F.3d at 828–29. Fears of generalized

harms are not enough. *Id.* at 828. The immigration judge determined that Orellana-Arias's fear of future persecution was too speculative to meet the burden for withholding of removal. The gang has not delivered on any threats against his family since he has been gone (nor did they while he was in El Salvador), gang members never asked Orellana-Arias to join MS-13 in the past nor punished him for failing to act as a police lookout. Nor have they extorted his family while he has been in the United States despite the fact that he had previously admitted to the gang members that he had been sending all of the money he earned in the United States home to his family so that they could repair their hurricane-damaged home.

That leaves for our consideration, Orellana-Arias's claim for protection under the Convention Against Torture. Orellana-Arias argues that the Board, in addressing the CAT claim in a single sentence, failed to attend to his arguments and demonstrate that it considered the evidence. It is true that an immigration judge must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Mansour v. I.N.S.*, 230 F.3d 902, 908 (7th Cir. 2000). But the Board is not "required to write an exegesis on every contention." *Id.* The Board is presumed to have reviewed the record and the burden is on the petitioner to prove that the agency failed to consider his arguments. *Rashiah v. Ashcroft,* 388 F.3d 1126, 1130 (7th Cir. 2004). Moreover, we review the immigration judge's decision wherever the Board has not supplanted it with its own rationale. *Jabateh v. Lynch*, 845 F.3d 332, 337 (7th Cir. 2017). Where the Board has spoken, we review its reasoning. *Id.* But where it has not, we review the immigration judge's reasoning. *Id.* To

the extent the Board's decision is lacking, therefore, we can look to the immigration judge's decision to fill in the gaps. Although it is true that the Board's discussion of the application for protection under CAT was quite cursory, the immigration judge dedicated several paragraphs to Orellana-Arias's CAT claim and thus we have sufficient reasoning from the immigration judge's decision, together with the Board's decision, to review.

The burden for CAT protection is no less stringent than that for withholding of removal. *Lozano-Zuniga*, 832 F.3d at 830. Orellana-Arias must demonstrate that it is more likely than not that he would be tortured if removed to El Salvador. *Id.*

> 'Torture' is defined as the intentional infliction of 'severe pain or suffering' for the purpose of coercion, punishment, or discrimination 8 C.F.R. §§ 1208.16(c)(2), 208.18(a)(1). Torture does not include 'lesser forms of cruel, inhuman or degrading treatment or punishment,' *id.* § 208.18(a)(2), or suffering inherent to 'lawful sanctions' imposed for violating the law, *id.* § 208.18(a)(3).

*Id.* (citing *Borovsky v. Holder*, 612 F.3d 917, 923 (7th Cir. 2010)). The applicant for CAT protection must demonstrate that the torture was inflicted by or at the behest of, or with the consent or acquiescence of, a public official. *Lozano-Zuniga*, 832 F.3d at 830.[3]

---

[3] Orellana-Arias objects to the immigration judge's use of the acquiescence standard alone without also including "willful blindness" explicit-

(continued…)

The immigration judge's decision, supplemented by that of the Board, concluded that Orellana-Arias had not sustained his burden of demonstrating that it was more likely than not that Orellana-Arias would be tortured if he returned to Mexico. In assessing whether Orellana-Arias has met his burden, the immigration judge must address various factors such as evidence of past torture, ability to relocate within the country, evidence of grave human rights violations or other relevant country conditions. *Tchenkou v. Gonzales*, 495 F.3d 785, 795 (7th Cir. 2007) (citing 8 C.F.R. § 208.16(c)(3)(i)–(iv)). The immigration judge referred back to her assessment of the withholding of removal claim, noting that his "CAT claim is based on the same arguments he made for withholding of removal." R. 138. Therefore the immigration judge addressed Orellana-Arias's evidence of past torture (R. 132–134, 138), his claim that he could not relocate within the country, (R. 129), and evidence of country conditions (R. 130–31, 134–35, 137–38), along with the accompanying details.

---

ly within the umbrella of acquiescence as some circuits have done. See, e.g., *Myrie v. Attorney Gen. United States*, 855 F.3d 509, 516 (3d Cir. 2017). Our circuit has not affirmatively adopted the "willful blindness standard" other than in passing while quoting the Board's decision. See *Lozano–Zuniga*, 832 F.3d at 831 ("As the Board held, '[t]he record does not sufficiently substantiate that any Mexican public official currently would seek to torture the respondent or would acquiesce in or exhibit willful blindness toward any torture inflicted on him by any gang member, any criminal, or anyone else.'") (citing decision of the Board below). But the Board in this case did indeed look to see whether the government was "willfully blind" to the gang activity and so even if that is the standard that this court requires, the two opinions, supplementing each other, engage in the correct evaluation.

The immigration judge, having concluded that Orellana-Arias did not suffer harm rising to the level of persecution, also concluded that he could not show that it was more likely than not that Orellana-Arias would be tortured should he return to El Salvador. All of his fear, the immigration judge concluded, was based on speculation. The immigration judge acknowledged that a couple of police officers had shot at him on one occasion as Orellana-Arias ran away from them, but the court concluded, with good reason based on Orellana-Arias's testimony, that this was a case of mistaken identity or a random act of violence and not torture inflicted by or at the behest of a public official. Orellana-Arias presented country condition reports speaking to the violence in the country and the government's inability to control it, including its acquiescence that results from corruption. R. 130–31, 134, 138. Nevertheless, none of this constituted evidence that Orellana-Arias specifically would be targeted for torture by the government or due to its acquiescence. "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Lozano–Zuniga*, 832 F.3d at 831 (citing 8 C.F.R. § 1208.18(a)(7)). We are not compelled to overrule the Board's finding that Orellana-Arias did not demonstrate that any torture would be at the acquiescence (or willful blindness, for that matter, see footnote 3, supra) of the government.

The Board's determination (along with that of the immigration judge where the Board had not spoken) is supported by reasonable, substantial, and probative evidence on the record considered as a whole and therefore the petition for review is DENIED.