In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1459

MIRATBEK ZHAKYPBAEV,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III, Attorney
General of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals
No. A205-802-225

ARGUED SEPTEMBER 19, 2017 — DECIDED JANUARY 26, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and ROVNER,
*Circuit Judges*.

ROVNER, *Circuit Judge*. The petitioner Miratbek Zhakypbaev
was a native and citizen of Kyrgyzstan, who was admitted to
the United States in September 2012 as a nonimmigrant
student to attend the Computer Systems Institute. His wife and

three daughters were admitted in December 2012 based on his status. The petitioner did not attend the Computer Systems Institute after February 4, 2013, and in April 2013, filed applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The petitioner's claims were premised on the events surrounding the ouster of Kyrgyz president Kurmanbek Bakiev in Kyrgyzstan in April 2010. The petitioner claimed that based on his connections with the Bakiev family and with the political party associated with Bakiev, he was persecuted during that time. He argued that he was eligible for asylum and withholding of removal because he was a victim of past persecution and had a well-founded fear of future persecution in Kyrgyzstan on account of his political opinion and his membership in a particular social group—that of persons associated with the Bakiev family. In addition, he claimed that he was entitled to protection under CAT.

The Immigration Judge (the IJ) denied relief, holding that the petitioner had failed to demonstrate that his persecution was connected to his political opinion or social group, and that he had failed to establish a threat of torture. The Board of Immigration Appeals (the Board) adopted and affirmed that denial, while also writing separately. The petitioner now appeals those determinations to this court.

Because the Board adopted and affirmed the IJ's conclusion with respect to the asylum and withholding of removal claims, as well as providing its own analysis, we review both decisions. *Bathula v. Holder*, 723 F.3d 889, 897 (7th Cir. 2013). We review the decisions denying asylum and withholding of removal for substantial evidence, applying *de novo* review to

legal questions but reversing factual findings only if the record lacks substantial evidence to support them. *Id.* at 897–98. Under the substantial evidence standard, we uphold the agency determination if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 898. "Reversal is appropriate only where, reviewing the record as a whole, 'a reasonable factfinder would have to' reach a contrary conclusion." *Id.*, quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

The Secretary of Homeland Security or the Attorney General may grant asylum to aliens who qualify as refugees under 8 U.S.C. § 1101(a)(42)(A). *Cojocari v. Sessions*, 863 F.3d 616, 620 (7th Cir. 2017); 8 U.S.C. § 1158(b)(1)(A). A person seeking asylum must meet the "stringent statutory requirements for all asylum seekers which require that the applicant prove (1) that she has suffered or has a well-founded fear of suffering harm that rises to the level of persecution, (2) on account of race, religion, nationality, membership in a particular social group, or political opinion, and (3) is unable or unwilling to return to her country because of the persecution or a well-founded fear of persecution." *Cece v. Holder*, 733 F.3d 662, 675 (7th Cir. 2013) (en banc); 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). Pursuant to the REAL ID Act of 2005, the applicant must show that one of those five protected grounds was at least one central reason for her persecution. *Cece*, 733 F.3d at 672 n.6; 8 U.S.C. § 1158(b)(1)(B)(i). Once an applicant proves past persecution, she is presumed to have a well-founded fear of future persecution, which the Attorney General may rebut by demonstrating that there is a change in

country conditions in the applicant's home country. *Cece*, 733 F.3d at 668; 8 C.F.R. § 1208.13(b)(1).

We turn first to the petitioner's claim that the Board and IJ erred in determining that he was not entitled to asylum or withholding of removal. In the proceedings below, the petitioner argued that his political opinion, and his membership in a particular social group, was a central reason for the harm and threats he suffered. The petitioner at oral argument emphasized that his appeal centered on the social group portion of the asylum and withholding of removal decision, but we will address the political opinion component as well because it is argued in the briefs. The petitioner does not challenge the discussion of facts as set forth in the IJ's decision and adopted by the Board, and therefore we rely on that recitation here.

During the petitioner's childhood, he grew up in the Jalal-Abad district, which is the area from which Bakiev originated. He was a neighbor of Bakiev's nephews, Kushtar and Sanzhar Bakiev, but did not remain in close contact with them beyond his childhood. In addition, while employed at a hotel restaurant in 1997, he met members of the Temirbaev family, which was a politically-powerful family under the Bakiev regime. Bakiev was president from 2005 until he was ousted in a coup on April 7, 2010. The petitioner believes that Bakiev was ousted with the help of Russia because he would not agree to close the American military base at Manas International Airport.

At the time of the coup, the petitioner was employed at Megacom, a telecommunications company which was owned

by one of Bakiev's sons, Maksim. On April 8, 2010, the petitioner was contacted by Kushtar Bakiev who told the petitioner that one of his properties had been confiscated by the interim government, and asked the petitioner to look after another property, a night club, that he owned. The petitioner went to the night club and witnessed what he described as an attack on the club by individuals connected to the interim government, culminating in the club owner being forced to transfer title of the property. Some of the people involved in the forced transfer of title later became parliamentary deputies for the ruling party, including Turatbek Madylbekov and Raikan Tologonov.

Madylbekov also became the head of the Internal Affairs Department for the city of Bishkek. On May 25, 2010, the petitioner was told to report to the prosecutor's office in Bishkek for an investigation. He was informed that his testimony was sought regarding criminal charges against Bakiev, members of Bakiev's staff, and the managers of Megacom. He was questioned by a man named Aibek, who informed him that they knew of his employment at Megacom and his movements on April 7 and 8. Aibek also alleged that the petitioner had helped Bakiev flee the country. According to the petitioner, Aibek wanted him to provide false testimony against Bakiev and the people connected to Bakiev's regime and Megacom, and proposed dictating a statement for the petitioner.

After the petitioner refused to testify or write such a statement, three men were summoned to the room and attacked him by forcing a plastic bag over his head for approximately one minute, grabbing him by the neck and

slamming his head into the desk, and kicking him when he fell to the ground, eventually causing him to lose consciousness. When the petitioner regained consciousness, a nurse was in the prosecutor's office with him, and he was taken to the hospital where he received stitches and remained for three days.

The petitioner testified to the IJ that he was beaten at the prosecutor's office because he witnessed the illegal seizure of the private property belonging to the Bakiev family by Madylbekov and Tologonov during the coup. Madylbekov's son Eldar was working as an investigator at the same prosecutor's office where the petitioner was beaten. The prosecutors wanted him to remain silent about those unlawful takings, and wanted him to testify against the Bakiev family and the Megacom management in order to provide a justification for the company's seizure and nationalization.

On June 6, the petitioner again was notified to report to the prosecutor's office. He went to the office and was again pressured to cooperate with the prosecution, but he was not subjected to further physical abuse. He returned to the prosecutor's office some days later and attempted to file a complaint regarding the mistreatment he had experienced but was unsuccessful in that effort.

A financial police unit filed a complaint in 2011 against Andrei Silich, the director of Megacom, alleging financial wrongdoing. Silich subsequently fled the country. In addition to being summoned to the prosecutor's office twice, the petitioner was interrogated by the financial police five times at his place of employment and two other times at the offices of the financial police. Following the 2010 coup, the interim

government obtained 49% of the shares of Megacom, and in 2014 the government obtained the remaining shares of the company.

Although Bakiev was ousted, his political party, Ata-Zhurt, won the most seats in parliament following the 2010 coup, which forced the ruling interim government to cooperate with the party despite the party's support for Bakiev. In July 2012, Eldar Madylbekov and Musa Tologonov were arrested in connection with their fathers' crimes during the 2010 coup. According to the petitioner, the sons were arrested because their fathers, as deputies in the parliament, were immune from prosecution. In August 2012, the petitioner received a summons to appear at the Office of Internal Affairs in Bishkek, which he believed was in relation to the arrests of Eldar and Musa. He did not appear as requested because Eldar's father, Turatbek Madylbekov, was the head of the office of Internal Affairs at the time, and he believed that he would be threatened and told to remain silent regarding the case against Eldar and Musa, and forced to testify against people related to Bakiev and the Ata-Zhurt party if he appeared.

In September 2012, the general director of the petitioner's company was replaced and the new director told him to resign. He did so and left for the United States. The police continued to send him summonses to his former residence and his mother's house throughout 2013. In 2014, his brother-in-law was contacted by the prosecutor's office and informed that there was now a criminal case against the petitioner and that he was suspected of concealing information.

The petitioner fears that he will be harmed by Eldar and Musa if he returns to Kyrgyzstan because he witnessed their fathers' unlawful actions in forcing the transfer of the title to the property. Although the petitioner testified that Eldar was convicted at trial and sentenced to nine years' imprisonment, he also contradicted that by stating that Eldar and Musa were cleared of charges and released from prison, and again by stating that the cases remained open on the same charges and that his testimony as a witness was still being sought.

The IJ found that the petitioner was generally credible in his testimony. The IJ noted, however, that in some instances the petitioner's testimony was inconsistent with his prior statements in his asylum application, and those inconsistencies related to his connections with the Bakiev and Temirbaev families that formed the bases of his alleged social group. According to the IJ, in his application, the petitioner "emphasized his long-time relationships with members of the Bakiev and Temirbaev families and also stated that he was promoted rapidly within Megacom 'due to [his] old connections and the friendship with the nephews of President Bakiev, Kushtar and Sanzhar, as well as with Arstan Temirbaev.' However, in his testimony, he admitted that he did not remain in contact with Kushtar and Sanzhar after childhood; they merely grew up nearby each other. He also asserted that he obtained his position with Megacom through his experience and education, and he denied that he was ever promoted because of his connections." IJ Op. at 7. The IJ concluded that the petitioner had exaggerated the extent of his connections with the Bakiev and Temirbaev families, but that apart from that aspect, the petitioner's testimony was credible

overall. We review that credibility determination deferentially, upholding it as long as it is supported by substantial evidence. *Cojocari*, 863 F.3d at 621.

As was stated, the petitioner in the proceedings below sought to demonstrate that he was unable or unwilling to return to his country because of persecution or a well-founded fear of persecution on account of his membership in a particular social group or political opinion. On appeal, he argues that the court erred in denying his claim related to his political opinion and to his membership in the social group. With respect to those claims, the IJ held that the beating that the petitioner suffered might be sufficient by itself to rise to the level of persecution, but that the petitioner had failed to demonstrate that the persecution was on account of his political opinion or his membership in the social group.

The IJ noted that a social group, in order to be cognizable, must share an immutable characteristic, and have sufficient homogeneity and cohesiveness. The claimed social group here was defined as "persons associated with the Bakiev family." The IJ was concerned that the group could lack homogeneity in that it was not clear how tenuous one's connections to Bakiev could be while still falling within the group, but the IJ determined that the group was cognizable if limited to those persons whose connections with Bakiev are strong enough to have pro-Bakiev political views imputed to them. The IJ held, however, that the evidence indicated that he was sought out because of his potential usefulness as a witness, and that there was no evidence that he was interrogated or beaten because of his membership in that social group, or that he had a well-founded fear of such persecution on that basis. The Board in

reviewing the IJ's decision noted that a persecutor's motivation is a matter of fact to be determined by the IJ, and is reviewed only for clear error. The Board concluded that the IJ did not clearly err in finding that the petitioner was interrogated and beaten because the prosecutor thought that he had information that would be useful in prosecuting individuals for financial crimes rather than because of his connection to the Bakiev family.

The critical issue in this appeal is whether the IJ and the Board erred in concluding that the petitioner had failed to demonstrate that the interrogation and beating were on account of his association with the Bakiev family. We defer to the factual conclusions, reversing only if the evidence compels a different result. *N.L.A. v. Holder*, 744 F.3d 425, 430 (7th Cir. 2014).

In order to demonstrate eligibility for asylum on the basis asserted here, it is not enough to establish that he is part of the claimed social group. Even if we assume that the petitioner is part of a cognizable social group consisting of persons associated with Bakiev, and that the petitioner was persecuted, the petitioner must also establish a particular link between his mistreatment and his membership in the social group. *Cece*, 733 F.3d at 674. For instance, as we explained in *Cece*, "an ethnic Rom (gypsy) who has been mistreated by the town mayor because of a long-standing business dispute would not be eligible for asylum even if the mayor has undoubtedly and unfairly mistreated him, and even if he belongs to an ethnic group that was frequently the target of persecution in his country. The persecution must still be 'on account of' the protected category." *Id.* The petitioner must demonstrate a

nexus between the persecution and the membership in the social group. *Orellana-Arias v. Sessions*, 865 F.3d 476, 484 (7th Cir. 2017).

Petitioner's own testimony as to the prosecutor's motivation supports the IJ's determination that the persecution was not related to his social group. The petitioner testified to the IJ that he was beaten at the prosecutor's office because he witnessed the illegal seizure of the private property belonging to the Bakiev family by Madylbekov and Tologonov during the coup. Madylbekov's son, Eldar, was working as an investigator at the same prosecutor's office where the petitioner was beaten. The petitioner further testified that the prosecutors wanted him to remain silent about those unlawful takings, and wanted him to testify against the Bakiev family and the Megacom management in order to provide a justification for the company's seizure and nationalization. That testimony supports the findings of the IJ and the Board that he was targeted because he witnessed the illegal taking and his testimony could harm Madylbekov and Tologonov or could provide a justification for the taking.

The petitioner's arguments on appeal also support the IJ and Board findings. On appeal, the petitioner repeats the assertions above as to the motivation for the persecution. In addition, he argues that he fears he will be harmed if returned to Kyrgyzstan because he witnessed Madylbekov's and Tologonov's misdeeds; he does not argue that he will be harmed because of his association with the Bakiev family. Finally, on appeal the petitioner argues that he is caught in the middle of two factions—those supporting the Bakiev government and those supporting the new government. He

asserts that because he knew what was occurring from the inside, his testimony would be important to each side in the fight.

That supports the findings by the IJ and the Board that he was targeted because of the value of his testimony as a witness, not because he was perceived as being associated with the Bakiev family. As he recognizes, he was a person whose testimony could help or hinder the case against either of the two factions. That is different from being targeted based on his affiliation with one faction.

Our opinion in *Orellana-Arias*, 865 F.3d 476, is illustrative of that distinction. In that case, Orellana-Arias argued that he was targeted for extortion because he was a member of a social group consisting of persons who are perceived by gangs and corrupt officials to have money because they are returning from the United States. *Id*. at 485. We recognized that the gang mentioned his return from the United States when it first approached him asking for money, and perceived him to be wealthy based on that association. *Id*. Nevertheless, we held that the nexus was not established because he presented no evidence that he was more of a target because he was deported from the United States, as opposed to any other country perceived to be wealthy, or if he had been identified as wealthy due to other factors such as through his job or lottery winnings. *Id*. We held that it was his perceived wealth alone that made him a target for the gang. *Id*.

Similarly, the evidence in this case indicates that petitioner was targeted for his perceived usefulness as a witness. He appears to have been identified as a potential witness because

of his presence at the scene of the forcible taking of property on April 8, 2010, and because of his employment at Megacom and the perception that he had connections with Bakiev associates. But it was his usefulness in the criminal investigation, and his potential damage to the individuals involved in the forced taking, that made him a target here. Even if his usefulness as a witness—and the potential threat he posed—was more apparent based on his perceived association with the Bakiev family, just as Orellana-Arias' perceived wealth stemmed from his association with the United States, the IJ and Board did not err in concluding that the petitioner was not targeted based on that association. See also *Bathula*, 723 F.3d at 901 (rejecting claim based on a social group of "those willing to participate in the legal process, despite great personal risk," where there was "no suggestion in the record that the land mafia sought to destroy the legal process generally, or to attack those who supported it," and the filings clearly demonstrated that the petitioner was a victim of intimidation for his specific testimony in a specific case against the land mafia); *Jun Ying Wang v. Gonzales*, 445 F.3d 993, 999 (7th Cir. 2006) (rejecting claim where the persecutors seeking to harm Wang did not do so based on her membership in a particular group or for any political opinion, but rather for her decision to cooperate with the government to reduce her own sentence). Based on the evidence here, the IJ and the Board properly could conclude that a person not associated with Bakiev but who possessed the petitioner's employment position and witnessed that forced transfer would also have been interrogated and beaten to seek his testimony, or at least that the association was not a central reason for the persecution.

The IJ and Board determination that the nexus was not established must be upheld unless the evidence compels a contrary conclusion. *Bueso-Avila v. Holder*, 663 F.3d 934, 938 (7th Cir. 2011). For instance, in *Bueso-Avila*, the petitioner presented evidence that he was persecuted by the gangs on account of his evangelical Christianity and that the government was unable to stop it. *Id.* at 935–36. Bueso-Avila testified that he was only threatened and injured by the gang after he joined his church youth group, and that he proselytized on behalf of that church and encouraged others not to join the gangs. *Id.* at 935. On two occasions, he was attacked by gang members following church youth group meetings, but suffered the most serious attack when returning home from work. *Id.* at 935–36. The gang members did not mention his religious affiliation or give any other indication that it was a factor, but Bueso-Avila testified that they were motivated to stop the encroachment on their territory by the church youth group. *Id.* at 935. We affirmed the Board's determination that the persecution was based on the gang's desire to recruit him and that his religious affiliation was not a central reason for the persecution. We recognized that the evidence supported a legitimate inference that the gang members persecuted Bueso-Avila on account of his religious and church membership, but held that the evidence was not so compelling that no reasonable fact-finder could fail to find that the gang was motivated to persecute him based on his religious affiliation. *Id.* at 938.

Because the evidence does not compel the conclusion that the petitioner's persecution was connected to his membership in that social group, we must uphold the decision of the IJ and

the Board. At best, the petitioner produced permissible evidence that could support an inference of the unlawful motive, but we cannot reverse unless the evidence is so strong as to require the factfinder to accept it. *Bathula*, 723 F.3d at 902; *Bueso-Avila*, 663 F.3d at 937, quoting *Elias-Zacarias*, 502 U.S. at 483–84 ("for reversal, the evidence must be 'so compelling that no reasonable factfinder could fail to find the requisite fear of persecution'" on account of race, religion, nationality, membership in a particular social group, or political opinion).

We turn, then, to his argument that he was persecuted on account of his political opinion. The relevant focus for this claim is the petitioner's political opinion, not that of the persecutor. *Elias-Zacarias*, 502 U.S. at 482 ("The ordinary meaning of the phrase 'persecution on account of … political opinion' in § 101(a)(42) is persecution on account of the *victim's* political opinion, not the persecutor's.") The petitioner contends that he participated in political activities, including collecting signatures and spreading leaflets for the Ata-Zhurt party, and attended political rallies for that party, although he did not actually join the party because his employer at that time prohibited it. That involvement, however, occurred in August 2010, months after he was interrogated and beaten in the prosecutor's office. Therefore, that support for the political party could not have been the basis for the past persecution. As the IJ noted, the petitioner's account of the initial interrogation and the demands of the prosecutor contained no reference to the petitioner's political views, but of course that would not be dispositive. It is a rare case in which a persecutor will openly declare the motivation for the abuse. It is certainly possible, of course, that the persecutors attributed a political opinion to the

petitioner based on his affiliation with Megacom and his relationships with the Bakiev family. But that is just a re-characterization of the social group argument just rejected, in that both are premised on the notion that his affiliation with Bakiev and his party was a central reason for the persecution, and it fails for the same reason. The evidence in this case does not compel a determination that the petitioner's political opinion was a central reason for the persecution. *Elias-Zacarias*, 502 U.S. at 481 n.1 (to reverse the IJ and Board finding, the evidence must compel the conclusion that the persecution was on account of his membership in a protected group.)

The petitioner has also failed to demonstrate that he had a well-founded fear of future persecution. A fear of persecution is "well-founded" if it is "subjectively genuine and objectively reasonable." *Musollari v. Mukasey*, 545 F.3d 505, 508 (7th Cir. 2008). The evidence indicates that he returned to the prosecutor's office for questioning on a number of occasions after the date of the beating, and was not subjected to further abuse. In addition, he was questioned on more than five occasions by the financial police but again not subject to other mistreatment. There is insufficient evidence in the record to compel the conclusion that the questioning was for a motive other than the desire to pursue valid criminal cases. In fact, although he maintains that the interrogators wanted him to file a false statement, he concedes that he does not actually know the content that they sought from him because it never got to that point. Finally, the evidence indicated that the political party which the petitioner claims to support, Ata-Zhurt, won the majority of the votes in the October 2010 election. Given all of those facts, the IJ and the Board did not err in determining

that the petitioner failed to demonstrate a well-founded fear of future persecution.

Finally, the IJ and Board did not err in determining that the petitioner was not entitled to withholding of removal or to protection under the CAT. Where, as here, a petitioner cannot demonstrate entitlement to asylum, he "necessarily cannot satisfy the more stringent requirement for withholding of removal under 8 U.S.C. § 1231(b)(3)." *Bueso-Avila*, 663 F.3d at 937, quoting *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003).

Regarding the CAT claim, the petitioner presents on appeal only the bare assertion that the Board erred in finding there was no substantial grounds for believing that he would be in danger of torture, but has failed to provide any argument as to why that determination was erroneous. The record on its face supports the determination of the IJ and Board. The petition for review is therefore

DENIED.